UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL** **'O'**

| | | | |
|---|---|---|---|
| Case No. | 2:26-cv-03816-CAS-BFMx | Date | July 27, 2026 |
| Title | Kennard Development Group v. Parsons Transportation Group, Inc. et al. | | |

| | | |
|---|---|---|
| Present: The Honorable | CHRISTINA A. SNYDER | |
| Catherine Jeang | Laura Elias | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Allina Amuchie<br>Mary Brady | Jeremy Ochsenbein<br>Marcellus McRae |

**Proceedings:** PARSON'S TRANSPORTATION GROUP, INC.'S AND PARSONS CORPORATION'S NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED COMPLAINT (Dkt. 17, filed on June 12, 2026)

## I. INTRODUCTION

On April 9, 2026, plaintiff Kennard Development Group ("KDG") filed this action against defendants Parsons Transportation Group, Inc. ("PTG"), Parsons Corporation (together, with PTG, the "Parsons Defendants"), and Does 1 through 20. Dkt. 1 ("Compl.") at 1. Plaintiff's complaint asserts ten claims: (1) breach of contract, against PTG and Does 1 through 10; (2) breach of the implied covenant of good faith and fair dealing, against PTG and Does 1 through 10; and (3) fraudulent inducement, against all defendants; (4) fraudulent misrepresentation, against all defendants; (5) negligent misrepresentation, against all defendants; (6) promissory fraud, against all defendants; (7) promissory estoppel, against all defendants; (8) common counts, against all defendants; (9) intentional interference with prospective economic relations, against all defendants; and (10) declaratory relief, against all defendants. Id. at 12-26.

On June 12, 2026, the Parsons Defendants filed the instant motion to dismiss KDG's complaint. Dkt. 17 ("Mot."). The Parsons Defendants concurrently filed a

request for judicial notice. Dkt. 17-5.[1] On July 6, 2026, KDG filed an opposition. Dkt. 20 (“Opp.”). On July 20, 2026, the Parsons Defendants filed a reply. Dkt. 12 (“Reply”).

On July 27, 2026, the Court held a hearing. Having carefully considered the parties’ arguments and submissions, the Court finds and concludes as follows.

## II. BACKGROUND

Plaintiff alleges the following in its complaint.

### A. The Parties

Plaintiff KDG is a California corporation with its principal place of business in Glendale, CA. Compl. ¶ 5.

Defendant PTG is an Illinois corporation doing business in California with a principal California office at 100 West Walnut St., Pasadena, California 91124. Id. ¶ 8.

Defendant Parsons Corporation is a Delaware corporation doing business in California, with a principal place of business at 100 West Walnut St., Pasadena, California 91124. Id. ¶ 9.

At all relevant times, defendants, and each of them, were the co-conspirators, agents, servants, employees, alter egos, successors-in-interest, subsidiaries, affiliated companies or corporations, and joint ventures of the other defendants, and were acting

[1] The Parsons Defendants request that the Court “take judicial notice of Exhibits 1 and 2 to the Zelenay Declaration because they are 1) a complaint filed in … prior litigation [in Los Angeles Superior Court] between the same parties as [thiss action], regarding the same contracts at issue in Defendants’ Motion, and 2) a copy of the docket from the same case.” Dkt. 17-5. “[The Parsons] Defendants cite Exhibit 1 for the fact that KDG previously made certain allegations, not for the truth of those allegations. Similarly, Defendants cite Exhibit 2 for the existence of certain court filings, not truth of the content of those filings.” Id. at 2. A court “may take judicial notice of court filings and other matters of public record.” Reyn’s Pasta Bella, LLC v. Visa USA, Inc., 442 F.3d 741, 746, n.6 (9th Cir. 2006). Accordingly, the Court finds it appropriate to take judicial notice of Exhibits 1 and 2 to the Zelenay Declaration for their existence but not the facts asserted therein.

within the course, scope, and authority of each other defendant. Id. ¶ 11. The Parsons Defendants' personnel held themselves out as working for "Parsons," and did not distinguish between the different Parsons entities in their communications and correspondence with KDG. Id. Each of the defendants acted in concert with, and with the consent of, each of the other defendants, and each of the defendants ratified or agreed to accept the benefits of the conduct of each of the defendants. Id.

### B. Factual Allegations

On or around, April 20, 2016, the City of Los Angeles, through Los Angeles World Airports ("LAWA"), issued a "Request for Proposals for Program Management, Project Management, and Project Controls Support Services ("the RFP") at Los Angeles World Airports for capital improvement projects at Los Angeles International Airport and Van Nuys Airport" (the "Project"). Id. ¶ 15. The RFP provided for the competitive bidding of different sized firms for contracts covering three services and contained a provision wherein all contracts issued to large firms would have a mandatory twenty percent Small Business Enterprise ("SBE") goal for scope of service. Id. ¶ 16.

Over the next month, more than two dozen firms approached KDG to discuss submitting a joint proposal in response to LAWA's RFP. Id. ¶ 17. KDG was in high demand because of its status as a Local Business Enterprise ("LBE"), SBE, Women Business Enterprise ("WBE"), and Minority Business Enterprise ("MBE"), and because KDG's President and Chief Executive Officer, Lydia Kennard ("Kennard") formerly served as the Executive Director of LAWA. Id. ¶¶ 6-7, 17.

KDG had a strong reputation and proven track record that was attractive to the Parsons Defendants because they had struggled in performing prior LAWA contracts. Id. ¶ 18. Knowing that KDG intended to submit its own proposal for a small firm Project/Construction Management ("PM/CM") contract, in or around late April 2016, Parsons approached KDG to discuss submitting a joint proposal to bid for the LAWA project ("LAWA Project"). Id. at ¶ 19.

On April 30, 2016, David Herbst ("Herbst"), the lobbyist for the Parsons Defendants, sent an email to Kennard, stating: "The [Parsons] guys were definitely impressed … They want to make a deal with you. And I am glad to be there to help

facilitate. *We kicked around some ideas on how to clearly makes this financially worthwhile to KDG.*" Id. ¶ 20 (emphasis in original).

The parties continued negotiations in May 2016. On May 6, 2016, Herbst sent KDG a document that outlined the key points in an ongoing relationship between KDG and the Parsons Defendants and which was signed by PTG's Vice President of Business Development – Aviation, Lou Russo ("Russo"), and PTG's then Senior Vice President of Aviation, Perfecto Solis ("Solis"). Id. ¶ 21. Some of these key points included discussion of the opportunity for KDG to double its revenue under the larger PM/CM contract, the opportunity for KDG to be viewed as an equal partner of the Parsons Defendants, and opportunities to partner with the Parsons Defendants on other projects. Id.

On May 16, 2016, the parties discussed the terms of a teaming agreement ("Teaming Agreement"), which is attached to KDG's complaint. Id. ¶ 23. As a subcontractor, KDG would have no authority or control as to how much, if at all, Parsons would actually staff KDG on the Project. Id. Parsons (through a different subsidiary) had previously availed itself of KDG's reputation and exploited its SBE status to bid a project in 2013, and then never used KDG's services on that project. Id.

At the May 16, 2016 meeting, Solis assured KDG that it would not have a similar negative experience in the event Parsons were awarded a large firm prime contract by LAWA. Id. ¶ 24. To assure KDG that the Project was financially worthwhile for KDG, the Parsons Defendants committed that "in exchange for KDG giving up its rights to submit its own proposal for a small firm prime contract or to work with other firms to jointly submit a proposal … [the Parsons Defendants] would pay KDG 40% of the overall contract value." Id.

On May 23, 2016, the parties' negotiations culminated in the execution of the Teaming Agreement, which memorializes the forty percent total contract value term (the "Forty Percent Commitment"). Id. ¶ 27. The Parsons Defendants subsequently reneged on all of the promises they made to KDG in its "key points" letter from May 2016 and the related Teaming Agreement. Id. ¶ 28.

Pursuant to the Teaming Agreement, the Parsons Defendants and KDG submitted a joint technical proposal for PM/CM services at LAWA (the "Joint Proposal") on June 16,

2026, which expressly stated that KDG would be awarded forty percent of the contract. Id. ¶ 29. In August 2016, Kennard gave a closing speech advocating for the Parsons Defendants to win the contract, and Herbst recognized Kennard’s critical role in helping Parsons secure a contract with LAWA with respect to the Project. Id. ¶ 32-33.

On September 21, 2016, the Board of Airport Commissioners (the “Board”) awarded the Parsons Defendants Contract No. DA-5135 (the “Contract”) to provide PM/CM services for an initial value of $35,000,000. Id. ¶ 34. KDG alleges that the Parsons Defendants would not have won the contract but for KDG’s efforts, expertise and contributions, and KDG would not have made such efforts if not for the Parsons Defendants’ representations to KDG that it would receive forty percent of the contract value. Id.

Although work on the Project commenced in late 2016, the Parsons Defendants had not staffed KDG on the Project even by March 2017. Id. ¶ 35. On March 1, 2017, Kennard wrote an email to the Parsons Defendants expressing her frustrations about the lack of staffing for KDG. Id. ¶ 36. Unbeknownst to KDG, the Parsons Defendants *purposely* failed to staff KDG in an attempt to walk back the Forty Percent Commitment. Id. ¶ 38 (emphasis in original). It was not until April 2017 after Kennard demanded that the Parsons Defendants staff KDG on the Project that they finally began giving KDG one-off task orders in connection with the Project. Id. ¶ 39.

The Parsons Defendants failed to negotiate a subcontract in good faith as they had promised and attempted to “strong-arm” KDG by threatening to withhold payment of the task orders until KDG executed a subcontract. Id. ¶ 40.

The initial draft subcontract prepared by the Parsons Defendants did not contain the Forty Percent Commitment, which the Parsons Defendants revised in a subsequent draft on March 24, 2017, to include: “**SP 8.2 Contractual Commitment** – Parsons recognizes the 40% commitment to Subconsultant of the total contract value, as established in a previously executed Teaming Agreement.” Id. ¶ 41. The Parsons Defendants also sent an email to KDG stating: “Per KDG’s request, **this agreement includes a special provision recognizing Parsons’ 40% commitment to KDG**.” Id. ¶ 42 (emphasis in original).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL 'O'**

| Case No. | 2:26-cv-03816-CAS-BFMx | Date | July 27, 2026 |
|---|---|---|---|
| Title | Kennard Development Group v. Parsons Transportation Group, Inc. et al. | | |

The parties exchanged multiple rounds of draft Subcontracts throughout 2017 through 2019 (including drafts by each party's respective counsel). The Parsons Defendants represented in writing that they would honor the Forty Percent Commitment, but failed to execute a Subcontract promising to do so. Id. ¶ 43.

On September 26, 2017, the Parsons Defendants' in-house counsel, Sal Scannapieco ("Scannapieco"), sent KDG an email affirming that "Parsons will make every effort to meet the commitment in the Teaming Agreement." Id. ¶ 44. Despite numerous representations by the Parsons Defendants that they would honor the Forty Percent Commitment, the Parsons Defendants failed to execute a draft subcontract with a payment mechanism that satisfied the Commitment. Id. ¶ 46.

The Parsons Defendants repeatedly represented to LAWA that they would be awarding KDG forty percent of the Project to comply with a general commitment of forty-two percent SBE participation on the Project. Id. ¶¶ 47-48. The Parsons Defendants knowingly made these false representations to LAWA and KDG and intended that LAWA and KDG rely on them. Id. ¶ 49. On January 17, 2018, KDG's then CFO, Jeffrey Lilly ("Lilly") encouraged the Parsons Defendants to meet with KDG to "prepare how and what to present to LAWA regarding the SBE requirements and how we will get our contract in compliance"; however, the Parsons Defendants did nothing to correct their false and misleading representations. Id. ¶¶ 50-51.

On April 5, 2018, the Board approved a first amendment to the Contract that increased the total contract value to $193,000,000. Id. ¶ 52. On August 3, 2023, the Board approved a second amendment to the Contract that further increased the total contract value to $212,913,000. Id. ¶ 53. Even after the Project was completed on December 31, 2024, the Parsons Defendants continued to represent to LAWA that they had awarded KDG forty percent of the Project. Id. ¶¶ 54-55.

## III. LEGAL STANDARD

### A. Rule 12(b)(6)

A motion pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims asserted in a complaint. Under this Rule, a district court properly dismisses a claim if "there is a 'lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.'" Conservation Force v.

Salazar, 646 F.3d 1240, 1242 (9th Cir. 2011) (quoting Balisteri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1988)). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). "[F]actual allegations must be enough to raise a right to relief above the speculative level." Id.

In considering a motion pursuant to Rule 12(b)(6), a court must accept as true all material allegations in the complaint, as well as all reasonable inferences to be drawn from them. Pareto v. FDIC, 139 F.3d 696, 699 (9th Cir. 1998). The complaint must be read in the light most favorable to the nonmoving party. Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001). However, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009); see Moss v. United States Secret Service, 572 F.3d 962, 969 (9th Cir. 2009) ("[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief."). Ultimately, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679.

Unless a court converts a Rule 12(b)(6) motion into a motion for summary judgment, a court cannot consider material outside of the complaint (e.g., facts presented in briefs, affidavits, or discovery materials). In re American Cont'l Corp./Lincoln Sav. & Loan Sec. Litig., 102 F.3d 1524, 1537 (9th Cir. 1996), rev'd on other grounds sub nom Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26 (1998). A court may, however, consider exhibits submitted with or alleged in the complaint and matters that may be judicially noticed pursuant to Federal Rule of Evidence 201. In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 986 (9th Cir. 1999); see Lee v. City of Los Angeles, 250 F.3d 668, 689 (9th Cir. 2001).

As a general rule, leave to amend a complaint which has been dismissed should be freely granted. Fed. R. Civ. P. 15(a). However, leave to amend may be denied when "the

court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." Schreiber Distrib. Co. v. Serv-Well Furniture Co., 806 F.2d 1393, 1401 (9th Cir. 1986).

### B. Rule 9(b)

Federal Rule of Civil Procedure 9(b) requires that the circumstances constituting a claim for fraud be pled with particularity. Federal Rule of Civil Procedure 9(b) applies not just where a complaint specifically alleges fraud as an essential element of a claim, but also where the claim is "grounded in fraud" or "[sounds] in fraud." Vess v. Ciba-Geigy Corp. U.S.A., 317 F.3d 1097, 1103–04 (9th Cir. 2003). A claim is said to be "grounded in fraud" or "'sounds in fraud'" where a plaintiff alleges that defendant engaged in fraudulent conduct and relies on solely on that conduct to prove a claim. Id. "In that event, . . . the pleading of that claim as a whole must satisfy the particularity requirement of [Fed. R. Civ. P.] 9(b)." Id. However, where a plaintiff alleges claims grounded in fraudulent and non-fraudulent conduct, only the allegations of fraud are subject to heightened pleading requirements. Id. at 1104.

A pleading is sufficient under Fed. R. Civ. P. 9(b) if it "[identifies] the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations." Walling v. Beverly Enters., 476 F.2d 393, 397 (9th Cir. 1973). This requires that a false statement must be alleged, and that "circumstances indicating falseness" must be set forth. In re GlenFed Sec. Litig., 42 F.3d 1541, 1548 (9th Cir. 1994). Thus, Rule 9(b) requires a plaintiff to "identify the 'who, what, when, where and how of the misconduct charged,' as well as 'what is false or misleading about [the purportedly fraudulent conduct], and why it is false." Cafasso, ex rel. United States v. Gen. Dynamics C4 Sys., Inc., 637 F.3d 1047, 1055 (9th Cir. 2011) (quoting Ebeid ex rel. United States v. Lungwitz, 616 F.3d 993, 998 (9th Cir. 2010)).

## IV. DISCUSSION

The Parsons Defendants move to dismiss all claims in KDG's complaint with prejudice. Mot. at ii. As an initial matter, the Parsons Defendants contend that all of KDG's claims are insufficient because they do not adequately distinguish between PTG and Parsons Corporation. Id. at 20. The Parsons Defendants argue that KDG's use of "Parsons" throughout its complaint treats the two separate Parsons Defendants

interchangeably and makes it impossible to determine which entity allegedly engaged in what conduct. Id.

In opposition, KDG argues that the complaint adequately distinguishes between the Parsons Defendants; KDG asserts breach of contract and breach of good faith claims only against PTG but asserts fraud and tort claims against the Parsons Defendants generally because they never distinguished between themselves in their communications with KDG. Opp. at 27. KDG further argues that even if the Parsons Defendants could claim insufficient notice, dismissal as a result would still be inappropriate because the allegations are not too vague such that it is impossible for defendants to respond to them. Id. at 27-28 (citing cases).

“Shotgun pleadings are pleadings that overwhelm defendants with an unclear mass of allegations and make it difficult or impossible for defendants to make informed responses to the plaintiff’s allegations.” Morris v. Sun Pharma Glob. Inc., No. 20-cv-1044I-PAJ (PRx), 2021 WL 3913191, at *3 (C.D. Cal. May 13, 2021) (quoting Sollberger v. Wachovia Securities. LLC, 9-cv-0766, 2010 WL 2674456, at *4 (C.D. Cal. June 30, 2010)). Such pleadings may be dismissed if they “fail to provide the opposing parties and the district court with sufficient notice of the claims and their basis.” Gibson v. City of Portland, 165 F.4th 1265, 1290 (9th Cir. 2026).

The Court finds that KDG’s complaint adequately puts both defendants PTG and Parsons Corporation on notice of the claims asserted against each of them. KDG asserts breach of contract and breach of the implied covenant of good faith only against PTG and Does 1 through 10 because PTG is the entity alleged to have executed the Teaming Agreement with KDG and submitted the Joint Proposal to LAWA. See Compl. ¶¶ 57, 62; Opp. at 26-27. Furthermore, KDG asserts fraud and tort claims against both Parsons Defendants because KDG claims that Parsons Corporation participated in and ratified misconduct through its officers, counsel, and agents including Russo, Solis, and Scannapieco. See Compl. ¶¶ 68, 76, 84; see United States ex rel. Chao v. Medtronic PLC, No. 2:17-CV-01903-MCS-SS, 2021 WL 4816647, at *13 (C.D. Cal. Apr. 12, 2021) (“Defendants’ reliance on corporation principles is misplaced, because [KDG] is not alleging a parent corporation … is responsible for the acts of another corporate entity, but instead is alleging that all defendants committed the same fraudulent conduct.”). Therefore, the Court finds that the complaint adequately puts the Parsons Defendants on notice of the claims asserted against each of them.

### A. Governing Law

The Parsons Defendants argue that the Teaming Agreement and the interpretation of its provisions are governed by District of Columbia law because the Teaming Agreement states: "The Agreement and the interpretation thereof shall be governed by the laws of the District of Columbia, excluding the Choice of Law provisions of District of Columbia." Mot. at 8; Dkt. 1-1 (Teaming Agreement) ¶ 16 ("Choice of Law Provision"). The Parsons Defendants contend that the Choice of Law Provision applies to all of KDG's claims. Mot. at 8.

In opposition, KDG argues that the Choice of Law Provision governs only KDG's first and second claims but does not govern KDG's remaining claims, including its fraud and tort claims. Opp. at 14.

In reply, the Parsons Defendants argue that District of Columbia law governs all of plaintiff's claims because under California law, a "valid choice-of-law clause, which provides that a specified body of law 'governs' the 'agreement' between the parties, encompasses all causes of action arising from or related to that agreement … including tortious breaches of duties emanating from the agreement or the legal relationships it creates." Reply at 2 (quoting Nedlloyd Lines B.V. v. Superior Court, 3 Cal. 4th 459, 470 (1992)).

The Court need not decide whether District of Columbia law or California law applies to plaintiff's claims because the parties have not argued that there is a conflict of laws.[2] Accordingly, the Court applies California law to determine the sufficiency of

---

[2] At oral argument, the Court requested counsel for the parties to explain whether a material difference exists between California law and District of Columbia law as applied to plaintiff's claims. In response, counsel for the parties did not answer the Court's question directly. Counsel for the Parsons Defendants argued that the parties need not demonstrate that a conflict of laws exist and that the Court must apply District of Columbia law to all of plaintiff's claims, given the valid Choice of Law Provision in the Teaming Agreement. Counsel for plaintiff argued that the Court need not undertake a conflict of laws analysis because all of plaintiff's claims survive the motion to dismiss under either jurisdiction's laws. Because the parties have not explained or argued that there is a conflict of laws between District of Columbia law and California law as applied

plaintiff's claims without deciding that California law governs. See Matter of Yagman, 796 F.2d 1165, 1170 (9th Cir. 1986) ("It is axiomatic that, unless there is a difference between the laws of the states, a choice need not be made."); Piping Rock Partners, Inc. v. David Lerner Assocs., Inc., 946 F. Supp. 2d 957, 976 (N.D. Cal. 2013), aff'd, 609 F. App'x 497 (9th Cir. 2015) ("Courts need not engage further in a choice of law analysis where there is no material conflict between the laws of the states involved.").

---

to plaintiff's claims, and because the Court at this stage finds it premature to decide the scope of the Choice of Law Provision as applied to plaintiff's claims, the Court finds it appropriate to analyze all of plaintiff's claims under California law without deciding that California law applies. See In re Apple Inc. Device Performance Litig., 386 F. Supp. 3d 1155, 1170 (N.D. Cal. 2019) ("Courts have declined to conduct [a choice-of-law] analysis at the motion to dismiss stage where further development of the record is necessary to properly decide the choice-of-law question."); CRS Recovery, Inc. v. Laxton, 600 F.3d 1138, 1142 (9th Cir. 2010) ("As a default, the law of the forum state will be invoked, and the burden is with the proponent of foreign law to show that the foreign rule of decision will further the interests of that state."). Because the Court at this stage declines to decide which of plaintiff's claims are subject to the Choice of Law Provision, it need not enforce the Provision at this time; accordingly, the Court declines to decide whether plaintiff's tort and fraud claims are governed by District of Columbia law or California law. See Nedlloyd Lines B.V. v. Superior Ct., 3 Cal. 4th 459, 466 (1992) (holding that only after a court decides that the parties' choice of law provision is enforceable and only after the court determines that "the chosen state's law is [not] contrary to a *fundamental* policy of California" "shall" "the court … enforce the parties' choice of law.") (emphasis in original). While the California Supreme Court in Nedlloyd determined at the pleading stage whether the parties' choice of law clause was enforceable, nothing in that decision holds that trial courts are required to do so at the pleading stage. See generally id.; see also Brazil v. Dole Food Co., Inc., No. CV 12-1831 LHK, 2013 WL 5312418, at *11 n.6 (N.D. Cal. Sept. 23, 2013) (collecting cases and noting the "conclusion … of numerous … courts with the Ninth Circuit" declining "to conduct the choice-of-law analysis at the pleading stage").

### B. Contract-Based Claims

The Parsons Defendants argue that KDG's claims for breach of contract, breach of the implied covenant of good faith, common counts, and declaratory relief (claims one, two, eight, and ten) (together, the "Contract-Based Claims") are premised on whether the Parsons Defendants violated the terms of the Teaming Agreement. Mot. at 19. As a threshold matter, the Parsons Defendants contend that because the Parsons Corporation is not a party to the Teaming Agreement, it cannot be held liable under any theory premised on that agreement. Id. The Parsons Defendants further argue that KDG cannot establish any liability premised on the terms of the Teaming Agreement because the Teaming Agreement expired in May 2017 and could only be modified by mutual written consent of the parties. Id. at 19-10. The Parsons Defendants also argue that even if the Teaming Agreement has not expired, it does not provide enforceable rights to support KDG's Contract-Based Claims because it is an agreement to agree. Id. at 10. The Parsons Defendants argue that the Teaming Agreement does not provide for profit-sharing unless established by a separate subcontract; leaves the price of a subcontract open to negotiation; and expressly states that there will be no liability if PTG decided not to enter into a subcontract with KDG for "any sound business reason" (the "Sound Business Reason Provision"). Id. at 10-11. The Parsons Defendants thus argue that the Teaming Agreement does not support KDG's claim that the Agreement gave KDG an automatic right to share forty percent of the contract revenue and cannot provide a basis for KDG's Contract-Based Claims. Id. at 11.

The Parsons Defendants argue that the Teaming Agreement is "an agreement to agree," which under District of Columbia law only creates an obligation to negotiate a potential subcontract in good faith. Id. (citing cases). The Parsons Defendants further argue that KDG cannot establish that PTG violated the obligation to negotiate a subcontract in good faith because KDG previously alleged in its state court complaint against the Parsons Defendants that defendant PTG first provided KDG a subcontract on March 2, 2017, and before Kennard allegedly demanded that KDG be staffed on the LAWA project; PTG subsequently revised that subcontract on March 24, 2017 to recognize the Forty Percent Commitment to KDG. Id. at 12. The Parsons Defendants argue that, if anything, KDG's allegations demonstrate that KDG did not negotiate in good faith by failing to respond to the March 24, 2017 revised subcontract until July 18, 2017—after the Teaming Agreement expired. Id. at 20. The Parsons Defendants also

argue that KDG's request for punitive damages under its breach of good faith claim is barred by the Teaming Agreement, which prevents either party from being liable for "special, indirect, incidental, or consequential damages." Id. at 14 (citing Teaming Agreement ¶ 12).

In opposition, KDG argues that even if the Teaming Agreement expired on May 23, 2017, the complaint adequately alleges the Parsons Defendants continued to treat the Teaming Agreement as operative by repeatedly reaffirming the Forty Percent Commitment to KDG and LAWA—among other conduct—even after the May 23, 2017 expiration. Opp. at 15. Accordingly, KDG argues that the Parsons Defendants have waived their right to argue and are estopped from arguing that the Teaming Agreement expired on May 23, 2017. Id. at 15-16. KDG argues that under District of Columbia law, a contractual deadline may be waived by the parties' subsequent conduct, that the waiver need not be explicit, and that whether waiver occurred is a fact question not appropriately resolved on a motion to dismiss. Id. KDG further argues that even if the Teaming Agreement expired, its expiration would not extinguish claims for breaches that occurred during the term of the Teaming Agreement and before it expired. Id. at 15, 17.

KDG further argues that the plain language of the Teaming Agreement contradicts the Parsons Defendants' argument that the Forty Percent Commitment to KDG was not binding. Id. at 17. KDG asserts that the Teaming Agreement was not an agreement to agree on the subcontract value because KDG and the PTG had already agreed to the Forty Percent Commitment. Id. KDG argues that the March 24, 2017 subcontract draft expressly acknowledged that the Forty Percent Commitment had already been established by the Teaming Agreement. Id.

KDG further argues that because the purpose of the Teaming Agreement was to induce KDG to forgo other opportunities to pursue the Project, PTG could not invoke the Sound Business Reason Provision to avoid its obligations under the Forty Percent Commitment. Id. at 18. KDG argues that adopting the Parsons Defendants' interpretation of the Sound Business Reason Provision would render the express Forty Percent Commitment meaningless. Id. KDG further argues that even if the Court finds that the Teaming Agreement is merely "an agreement to agree," it is still enforceable as a "Type I" agreement under District of Columbia law, which "occurs when the parties have reached complete agreement . . . on all the issues perceived to require negotiation." Id. (citing case). Alternatively, KDG argues that if the Teaming Agreement is a "Type II"

agreement,[3] PTG would nonetheless be contractually prohibited from using the subcontract process to eliminate or materially alter the Forty Percent Commitment. Id. at 19. KDG argues that disputes over whether the parties intended the Teaming Agreement to constitute a binding agreement and disputes over what terms they considered material are factual questions that cannot be resolved on a motion to dismiss. Id.

KDG argues that it sufficiently alleges that the Parsons Defendants engaged in actionable breach of the implied covenant of good faith and fair dealing. Id. at 20. KDG also argues that even if the Forty Percent Commitment term is ambiguous, its meaning cannot be resolved on a motion to dismiss. Id. KDG argues that the “price and delivery schedule” language from the Teaming Agreement did not redefine or limit the Forty Percent Commitment but only explained that the subcontract would establish the mechanics of KDG’s performance under the prime contract. Id. at 21. Finally, KDG argues that the breach of implied covenant claim seeks to recover the benefit of the parties’ bargain and therefore is a direct expectation damage, not a consequential damage that is foreclosed by the Teaming Agreement. Id.

In reply, the Parsons Defendants argue that KDG’s argument that “the automatic expiration was waived by the Parsons Defendants’ subsequent conduct is inconsistent with the language of the Teaming Agreement” because the Agreement provides that the Teaming Agreement could only be modified “by the mutual ***written*** consent of the Parties.” Reply at 3 (quoting Teaming Agreement ¶ 13). They further argue that KDG may not assert claims for breach of the Teaming Agreement before its expiration in May 2017 because the Project was not completed until December 31, 2024, and “there was no way to determine what the total contract would be at the time the Teaming Agreement expired on May 23, 2017.” Id. at 5. The Parsons Defendants repeat that the Teaming Agreement did not create a binding obligation entitling KDG to 40% of the value of the LAWA contract. Id. at 6-9. As to KDG’s claim for breach of the implied covenant of good faith and fair dealing, the Parsons Defendants argue that “KDG … has failed to

---

[3] KDG explains that under District of Columbia law, a Type II agreement “imposes a binding obligation to negotiate in good faith within the framework established by the preliminary agreement and prohibits a party from ‘renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement.’” Opp. at 19 (citing case).

plausibly plead facts supporting a claim that PTG violated its obligation to negotiate a subcontract in good faith" because "[the] judicially-noticeable allegations in [KDG's] previous [state court] complaint" do not support an inference that PTG acted in bad faith in negotiating a subcontract. See id. at 9-10.

As an initial matter, the Court finds that KDG has adequately alleged that the Teaming Agreement's expiration on May 23, 2017 does not foreclose KDG's Contract-Based Claims because the allegations in the complaint support a plausible inference that PTG waived such expiration deadline through its acts, words, or conduct. See CBS, Inc. v. Merrick, 716 F.2d 1292, 1295 (9th Cir. 1983) (a "contractual deadline may be waived by acts, words or conduct inconsistent with the deadline.").

The Court finds that plaintiff has adequately alleged that the Teaming Agreement obligates PTG to award forty percent of the total Contract value, and that PTG breached this Forty Percent Commitment by "refusing to honor its contractual commitment to pay KDG 40% of the total value of the LAWA Contract." Compl. ¶ 59. "[U]nder California law, an agreement for future negotiations is not considered a contract." 1440 Sports Mgmt. Ltd. v. PGA Tour, Inc., No. 22-CV-02774-TLT, 2023 WL 7280444, at *14 (N.D. Cal. Oct. 6, 2023); see also Copeland v. Baskin Robbins U.S.A., 96 Cal. App. 4th 1251, 1256 (2002) ("It is still the general rule that where any of the essential elements of a promise are reserved for the future agreement of both parties, no legal obligation arises 'until such future agreement is made.'") (citations omitted). "Thus, the failure to reach a meeting of the minds on all material points prevents the formation of a contract *even though the parties have orally agreed upon some of the terms, or have taken some action related to the contract.*" Banner Entertainment, Inc. v. Superior Court (Alchemy Filmworks, Inc.), 62 Cal. App. 4th 348, 359 (1998) (emphasis in original). However, courts may nonetheless enforce a "contract to negotiate the terms of an agreement," under which "[a] party will be liable only if a failure to reach ultimate agreement resulted from a breach of that party's obligation to negotiate or to negotiate in good faith." Copeland, 96 Cal. App. 4th at 1257.

Here, however, the Court finds there is ambiguity as to whether the Teaming Agreement goes beyond an agreement for future agreements and obligates PTG to award plaintiff 40% of the total contract value. The Teaming Agreement expressly states that "Parson's commitment to KDG is 40% of the total contract value." Teaming Agreement ¶ 1. In exchange for such commitment, the Teaming Agreement provides that, among

other things, "[KDG] shall support Parsons, on an exclusive basis for the PM/CM RFP, during the Proposal preparation period and during the term of the Subcontract. …" Id. ¶ 2. While other provisions in the Teaming Agreement suggest that the Forty Percent Commitment was not binding on PTG, the Court at this stage cannot conclude that, when read as a whole, the Teaming Agreement does not oblige PTG to honor the Forty Percent Commitment. Shakey's Inc. v. Covalt, 704 F.2d 426, 434 (9th Cir. 1983) ("A written contract must be read as a whole and every part interpreted with reference to the whole."); Alta Devices, Inc. v. LG Elecs., Inc., 343 F. Supp. 3d 868, 878 (N.D. Cal. 2018) ("A court may resolve contractual claims on a motion to dismiss [only] if the terms of the contract are unambiguous.").

The Parsons Defendants are correct that other provisions in the Teaming Agreement cast doubt on plaintiff's assertion that the Forty Percent Commitment in the Teaming Agreement is binding on PTG. The Teaming Agreement provides that "[n]othing herein shall be construed as providing for the sharing of profits or losses arising out of the efforts of the parties except as may be provided for in any resultant [sub]contract agreed by the parties." Teaming Agreement ¶ 1. However, the issue of whether PTG and plaintiff agreed to "share profits or losses" does not nullify or negate that "Parson's commitment to KDG is 40% of the total contract value." Teaming Agreement ¶ 1. An agreement (or lack thereof) to share profits from the Contract may be distinct from a commitment to sharing the contract value, and the Court cannot at this stage unambiguously determine that the "sharing of profits or losses" provision nullifies the Forty Percent Commitment. See Pabalan v. ICI Americas, Inc., 977 F.2d 590 (9th Cir. 1992) ("As an express disclaimer can nullify even an otherwise certain agreement."). The Teaming Agreement also provides that "[a]ny subcontract shall be subject to the mutual agreement of Parsons and [KDG] relative to terms and conditions, including price and delivery schedule, except that it shall contain … Parson's standard terms and conditions, and clauses derived from [LAWA's] prime contract, or as required by Parsons and or [LAWA]." Teaming Agreement ¶ 2. The Teaming Agreement also states that "[n]o party shall have any liability to the other arising out of this Agreement … if Parsons declines for any sound business reason to enter into the Subcontract with [KDG]." Id. ¶ 9. However, such provisions do not unambiguously negate or nullify the Forty Percent Commitment, which is sufficiently alleged by plaintiff to impose an obligation on PTG independent of any subsequently negotiated subcontract between the PTG and plaintiff.

It follows that KDG’s eighth claim for common counts, which relies on the same allegation that PTG breached the Forty Percent Commitment, and KDG’s tenth claim for a “declaratory judgment that Parsons’s payments to KDG must total at least 40% of the total value of the LAWA Contract,” Compl. ¶ 113, are adequate. See 3W s.a.m. tout bois v. Rocklin Forest Prods., Inc., No. 2:10-CV-01070, 2011 WL 489735, at *5 (E.D. Cal. Feb. 7, 2011) (“Because the Court declines to dismiss Plaintiff’s claim for breach of contract, this Court sees no reason to dismiss Plaintiff's common count for money had and received.”).

The Court further finds that KDG adequately states a breach of contract claim against PTG based on the allegation that PTG breached its agreement to negotiate a subcontract in good faith pursuant to the Teaming Agreement. The Teaming Agreement obligates “[KDG and PTG] … to negotiate in good faith to achieve such mutual agreement” with respect to any subcontract. Teaming Agreement ¶ 2. Here, KDG adequately alleges that PTG “breached the Teaming Agreement by, among other things, repeatedly and continuously failing to use good faith efforts to negotiate a Subcontract with KDG.” Compl. ¶ 59.

Moreover, KDG adequately alleges that that PTG breached the implied covenant of good faith and fair dealing by alleging that PTG failed to negotiate a subcontract in good faith. To state a claim for a breach of the covenant of good faith and fair dealing, KDG must allege “(1) the parties entered into a contract; (2) the plaintiff fulfilled his obligations under the contract; (3) any conditions precedent to the defendant's performance occurred; (4) the defendant unfairly interfered with the plaintiff's rights to receive the benefits of the contract; and (5) the plaintiff was harmed by the defendant’s conduct.” Rosenfeld v. JP Morgan Chase Bank, N.A., 732 F. Supp. 2d 952, 968 (N.D. Cal. 2010). Here, KDG sufficiently alleges that the parties entered into the Teaming Agreement; that KDG itself negotiated a subcontract in good faith; that PTG was obligated to negotiate a subcontract in good faith; that PTG repeatedly attempted to force KDG to execute a subcontract with terms inconsistent with its contractual commitment under the Teaming Agreement and knowingly and intentionally failed to provide KDG with sufficient opportunities to provide staffing on the Project; and that KDG has been damaged as a result. Compl. ¶¶ 61-65. Thus, the Court finds that KDG has adequately stated a claim for breach of the implied covenant of good faith and fair dealing. The Court finds that the Parsons Defendants’ arguments regarding KDG’s

ability to recover damages for such alleged breach are more appropriately decided on a more developed record and not on the instant motion to dismiss.

Accordingly, the Court **DENIES** the Parsons Defendants' motion to dismiss plaintiff's claims for breach of contract, breach of the implied covenant of good faith, common counts, and declaratory relief (claims one, two, eight, and ten).

**C. Fraud-Based Claims**

The Parsons Defendants argue that KDG's claims for fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation, promissory fraud, and promissory estoppel (claims three through seven) all sound in fraud (the "Fraud-Based Claims"). Mot. at 14. The Parsons Defendants argue that while KDG makes conclusory allegations that the Parsons Defendants made misrepresentations from May 2016 through 2019, the only statements identified in KDG's causes of actions all predate the execution of the Teaming Agreement and are barred because the Teaming Agreement contains an integration clause that prevents statements allegedly made outside of the agreement from being used to state a claim. Id. at 15-16 (citing cases). The Parsons Defendants further argue that the economic loss rule prevents KDG from repackaging alleged contractual duties as fraud claims. Id. at 16. Finally, the Parsons Defendants assert that even if KDG's Fraud-Based Claims are not precluded as a matter of law, KDG does not satisfy the requirements of Rule 9(b) by failing to plead them with the requisite particularity. Id. at 16-17. The Parsons Defendants argue that KDG fails to allege the dates of misrepresentations by the Parsons Defendants with sufficient specificity and that KDG fails to plead what was specifically false or misleading about the alleged statements. Id. at 17-18.

In opposition, KDG argues that both California and District of Columbia law recognize that an integration clause does not bar a claim for fraud in the inducement. Opp. at 22. Alternatively, KDG argues that whether an integration clause precludes a fraud claim presents factual questions that cannot be resolved at the pleading stage. Id. Additionally, KDG argues that in both California and District of Columbia law, the economic loss rule does not limit recovery for fraud or negligent misrepresentation claims. Id. at 23. KDG further argues that the Fraud-Based Claims are adequately plead with particularity under Rule 9(b) because KDG identified the who, what, when, and where of the Parsons Defendants' misrepresentations. Id. at 23-24. Finally, KDG argues

that its Fraud-Based Claims are not barred by the statute of limitations because the Parsons Defendants are equitably estopped for "lull[ing]" KDG into inaction. Id. at 25.

In reply, the Parsons Defendants largely repeat their arguments. See Reply at 10-14.

Under California law, "[e]vidence extrinsic to the contract is always permissible to prove fraud in the inducement of the contract pursuant to both common and statutory law. The integration clause has no effect in contract actions alleging fraud." 625 3rd St. Assocs., L.P. v. Alliant Credit Union, 633 F. Supp. 2d 1040, 1051 (N.D. Cal. 2009); see also Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn., 55 Cal. 4th 1169, 1174-1176, 1182 (2013) (holding that a fraud claim based on fraudulent procurement of a contract is not barred by the presence of an integration clause and that "[t]he fraud exception has been part of the parol evidence rule since the earliest days of our jurisprudence"). Thus, despite the presence of any integration clause in the Teaming Agreement, KDG may rely on alleged statements made by the Parsons Defendants extrinsic to the Teaming Agreement to support its Fraud-Based Claims.

As to the Parsons Defendants' arguments regarding the economic loss rule, California law provides that "a party to a contract generally cannot recover for pure economic loss—*i.e.*, damages that are solely monetary—that resulted from a breach of contract unless he can show a violation of some independent duty arising in tort." Rattagan v. Uber Techs., Inc., 19 F.4th 1188, 1191 (9th Cir. 2021), certified question answered, 17 Cal. 5th 1 (2024). Furthermore, the California Supreme Court has previously held "that the economic loss rule does not bar fraud claims premised on affirmative misrepresentations" because "this species of fraud constitutes tortious conduct separate from a breach of contract." Id. District courts in the Ninth Circuit have further held that "negligent misrepresentation claim[s] [are] not barred by the economic loss doctrine." Toyo Tire Holdings of Americas Inc. v. Ameri & Partners, Inc., 753 F. Supp. 3d 966, 981 (C.D. Cal. 2024). The Court finds that none of KDG's Fraud-Based Claims are foreclosed by the economic loss rule because they rely on allegations that the Parsons Defendants engaged in affirmative fraudulent and negligent misrepresentations that constitutes tortious conduct separate from a breach of contract. See Compl. ¶¶ 71-72, 77-82, 85-88.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL 'O'**

| Case No. | 2:26-cv-03816-CAS-BFMx | Date | July 27, 2026 |
|---|---|---|---|
| Title | Kennard Development Group v. Parsons Transportation Group, Inc. et al. | | |

Next, the Court considers whether KDG's Fraud-Based Claims are barred by the statute of limitations. The Parsons Defendants argue that because the parties entered into a tolling agreement on May 20, 2019, and given the three-year statute of limitations for fraud claims, any misrepresentations alleged by KDG that occurred before May 20, 2016 are time-barred. Mot. at 17; see Cal. Civ. Proc. Code § 338(4). In opposition, KDG argues that its Fraud-Based Claims are not time barred under the parties' tolling agreements and that, in any event, the Parsons Defendants are equitably estopped from asserting the statute of limitations because the Parsons Defendants' conduct "lull[ed] [KDG] into failing to bring suit." Stitt v. Williams, 919 F.2d 516, 523 (9th Cir. 1990). The Court finds that plaintiff's Fraud-Based Claims may not be dismissed for being time-barred at least because the issues of whether the Parsons Defendants lulled KDG into failing to bring suit presents factual questions that cannot be resolved on a motion to dismiss.

Finally, the Court considers whether KDG's Fraud-Based Claims are pled with requisite particularity. Under Rule 9(b), "a pleading must identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." Davidson v. Kimberly-Clark Corp., 889 F.3d 956, 964 (9th Cir. 2018) (citation omitted). The Court finds KDG's Fraud-Based Claims may not be dismissed at least because KDG pleads with requisite particularity the alleged fraudulent misrepresentation that occurred in an September 26, 2017 email communication from Parsons' in-house counsel Scannapieco to KDG. KDG specifically alleges that Scannapieco, in the September 26, 2017 email to KDG, misrepresented that "Parsons will make every effort to meet the [Forty Percent] [C]ommitment in the Teaming Agreement." Compl. ¶ 44; see 625 3rd St., 633 F.Supp.2d at 1051 (holding a fraud claim is pled with particularity when "[p] laintiff has identified a specific defendant, the content of the fraud, and a time frame in which the alleged fraud occurred."). KDG further alleges that Scannapieco's statement was false at the time it was made because the Parsons Defendants never intended to honor the Forty Percent Commitment. Compl. ¶ 78. Elsewhere, KDG alleges that at specific times, specific representatives of the Parsons Defendants (including Solis and Russo) made false representations that KDG would receive forty percent of the total contract value and negotiate a subcontract implementing that commitment, and that such false representations were made "with the intent to induce KDG into entering into the Teaming Agreement" that caused damage to plaintiff. See Compl. ¶¶ 21, 24, 73.

In conclusion, the Court finds that there is no basis to dismiss KDG's Fraud-Based Claims because they are adequately pleaded.

Accordingly, the Court **DENIES** the Parsons Defendants' motion to dismiss plaintiff's claims for fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation, promissory fraud, and promissory estoppel (claims three through seven).

**D. Intentional Interference Claim**

The Parsons Defendants argue that KDG's ninth claim for intentional interference with prospective economic relations is insufficiently pleaded. Mot. at 18. The Parsons Defendants argue that KDG fails to identify the other opportunities with third parties it claims to have forgone in favor of negotiating with PTG, and that KDG fails to allege that PTG had the specific intent to interfere with relationships between KDG and third parties. Id. at 19. The Parsons Defendants further contend that the success or failure of KDG's relationship with other third parties were entirely dependent on LAWA awarding a contract to that unspecified joint proposal, which is too remote an expectancy to support a claim for intentional interference. Id. at 20 (citing cases).

In opposition, KDG argues that under California and District of Columbia law, to adequately plead an intentional interference claim, it is not required to identify specific third-party relationships with which the Parsons Defendants interfered. Opp. at 25-26. KDG argues that its intentional interference claim satisfies the "minimal" showing required under District of Columbia law because the complaint alleges that numerous firms approached KDG seeking to partner with KDG on the Project, that the Parsons Defendants knew of those opportunities and induced KDG to forgo them, and that KDG suffered economic harm as a result. Id. at 26.

In reply, the Parsons Defendants largely repeat their arguments. See Reply at 14-16.

To state a claim for intentional interference with prospective economic relations under California law, a plaintiff must allege: "'(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the

relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant.’ [Citations.]” Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1153 (2003) (quoting Buckaloo v. Johnson, 14 Cal.3d 815, 827 (1975)). Contrary to the Parsons Defendants’ argument, “specific intent is not a required element of the tort of interference with prospective economic advantage.” Korea Supply, 29 Cal. 4th at 1154. Although KDG “is not required at the pleading stage to identify by name the prospective [partners], [KDG] is required to identify a particular relationship or opportunity with which the [Parsons Defendants’] conduct is alleged to have interfered.” 7EDU Impact Acad. Inc. v. You, 760 F. Supp. 3d 981, 1001 (N.D. Cal. 2024) (internal citations omitted).

The Court finds that KDG has sufficiently alleged a claim for intentional interference with prospective economic relations. The complaint alleges that “more than two dozen firms approached KDG in furtherance of discussing submitting a joint proposal in response to LAWA’s RFP for the Project.” Compl. ¶ 17. KDG’s complaint further alleges that the Parsons Defendants knew of plaintiff’s potential business opportunities with Parsons’ competitors with respect to the LAWA RFP; that the Parsons Defendants sought to submit the Joint Proposal with KDG with the intention of preventing KDG from partnering with the Parsons Defendants’ competitors; that KDG forwent these opportunities to partner with Parsons’ competitors as a result of the Parsons Defendants’ conduct, and that KDG suffered damages because the Parsons Defendants refused to honor the Forty Percent Commitment. Id. ¶¶ 107-110. Thus, the Court finds that KDG has adequately alleged all the elements of an intentional interference claim under California law.

Accordingly, the Court **DENIES** the Parsons Defendants’ motion to dismiss plaintiff’s ninth claim for intentional interference with prospective economic relations.

### E. Punitive Damages

The Parsons Defendants further argue that even if the Court does not dismiss KDG’s claims, it should strike KDG’s prayer for punitive damages because KDG fails to allege that an employee of the Parsons Defendants acted with malice, oppression, intent to injure, or willful disregard for KDG’s rights, nor does KDG allege that the employee’s conduct was outrageous, grossly fraudulent, or reckless. Mot. at 17 (citing cases).

In opposition, KDG argues the complaint adequately alleges that the Parsons Defendants acted intentionally and in wanton disregard of KDG's rights to sufficiently state a claim for punitive damages. Opp. at 28.

In reply, the Parsons Defendants largely repeat their arguments. Reply at 17.

Under California law, to state a claim for punitive damages against a corporate employer based on the acts of its employees, a plaintiff must allege "the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice ... on the part of an officer, director, or managing agent of the corporation." Cal. Civ. Code § 3294(b). Furthermore, "the Ninth Circuit has not extended the Twombly and Iqbal standard to punitive damages allegations." Fashion Nova v. Sentry Ins. Co., No. 2:26-CV-00580-CAS-MAAX, 2026 WL 915168, at *8 n.2 (C.D. Cal. Apr. 2, 2026). Thus, plaintiffs "need not plead any particularity in connection with an averment of intent, knowledge or condition of the mind." Id. (internal citations omitted); see also Rule 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").

Here, KDG alleges that Solis, Russo, and Scannapieco—employees of the Parsons Defendants—made misrepresentations that they knew were false and with the intent to defraud KDG during subcontract negotiations. Compl. ¶¶ 77-78, 80, 82. Moreover, KDG alleges that "Solis and Russo were at all relevant times … managing agent[s] of one or more of [the Parsons Defendants], or in the alternative, that all actions taken by Solis and Russo as alleged herein were ratified by a managing agent of [the Parsons Defendants]." Id. ¶ 76. The Court finds that these statements adequately allege that managing agents of the Parsons Defendants engaged in an fraudulent acts; accordingly, plaintiff's claim for punitive damages against the Parsons Defendants are sufficient. Cal. Civ. Code § 3294(b).

## V. CONCLUSION

In accordance with the foregoing, the Court **DENIES** the Parsons Defendants' motion to dismiss KDG's complaint.[4]

---

[4] At oral argument, counsel for the Parsons Defendants made numerous arguments that plaintiff's claims are insufficient to survive the instant motion to dismiss. The Court

The Parsons Defendants shall file an answer to KDG’s complaint within twenty-one (21) days of the date of this order.

IT IS SO ORDERED.

| | 00 : 25 |
|---|---|
| Initials of Preparer | CMJ |

disagrees and finds that counsel’s arguments are more appropriately decided on a more developed record. As pleaded, plaintiff’s claims are sufficient and provide adequate notice to each defendant of the claims asserted against it.